Michael A. Caddell (State Bar No. 249469)
mac@caddellchapman.com
Cynthia B. Chapman (State Bar No. 164471)
cbc@caddellchapman.com
Amy E. Tabor (State Bar No. 297660)
aet@caddellchapman.com
CADDELL & CHAPMAN
628 East 9th Street
Houston TX 77007-1722
Telephone: (713) 751-0400
Facsimile: (713) 751-0906

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHEN MARELICH, individually and on behalf of others similarly situated, | Case No. [Case No.] |
| *Plaintiff,* | **PLAINTIFF'S ORIGINAL CLASS ACTION COMPLAINT** |
| *v.* | |
| CINEMARK USA, INC., | |
| *Defendant.* | |

Plaintiff Stephen Marelich files this Original Class Action Complaint against Defendant Cinemark USA, Inc. ("Cinemark"). Through its website, Cinemark is sharing its customers' private video viewing information without obtaining the legally required consent in violation of the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"). Plaintiff accordingly brings this action to recover damages on behalf of himself and all similarly situated individuals under the VPPA.

## I.     INTRODUCTION

1.     The VPPA protects consumers' privacy when they purchase or rent video content. In passing the VPPA, Congress recognized that the choice of what video content to watch, like the choice of which books to read, bears on important intellectual privacy interests.

2.     First passed in the wake of public disclosures of then-Supreme-Court nominee Robert Bork's private video rentals, the VPPA protects information "which identifies a person as having requested or obtained specific video materials or services." 18 U.S.C. § 2710(a)(3). To enforce consumers' rights to keep their video viewing histories private, Congress created a civil cause of action against any video content provider who knowingly discloses consumers' personally identifying information. 18 U.S.C. § 2710(b). Because Congress defined "video tape service provider" broadly "to ensure that VPPA's protections would retain their force even as technologies evolve,"[1] companies that sell video services online are equally subject to its strictures. Remedies for violating the statute include actual damages, punitive damages, and/or liquidated damages of not less than $2,500.

3.     Cinemark is a movie theater chain which operates more than 300 theatres in the United States, including numerous theatres in the Northern District of California. Cinemark allows patrons to purchase tickets through its website.

4.     When consumers visit Cinemark's website, they can view pages with previews and information about movies that interest them using their internet browsers. If they choose to, they

---

[1] *In re Hulu Privacy Litig.*, No. 11-cv-03764, 2012 WL 3282960, at *6 (N.D. Cal. Aug. 10, 2012).

can then purchase tickets to watch the movies in theaters. Unbeknownst to the consumers, however, the information regarding which videos they decide to watch is not private.

5.    In violation of the VPPA, Cinemark has partnered with Meta Platforms, Inc. ("Meta") and its "Facebook" social media platform to collect personally identifiable information each time a consumer views a video or purchases a ticket on Cinemark's website. Simultaneously, as soon as a consumer decides to visit a video page on Cinemark's website, a tiny, invisible piece of computer code called the "Meta Pixel" collects the page's address, including the video's title, and sends the information directly to Facebook, together with a digital ID that allows Facebook to match the information to the consumer's Facebook profile and all of the other information Facebook may have about that consumer's demographics, affiliations, and tastes.

6.    Cinemark benefits from this unauthorized disclosure by receiving enhanced analytics and advertising services, and Meta benefits by adding consumers' valuable information to its marketing databases, which it can then use to sell targeted advertisements. The only losers are the unwitting consumers. Without even realizing what is happening, they have valuable information about their tastes and private media consumption appropriated to fuel Facebook's multi-billion dollar advertising machine. Plaintiff, Stephen Marelich, brings this action to vindicate these consumers' rights.

## II.    PARTIES

7.    Plaintiff Stephen Marelich is an individual who during the relevant time period resided in Fremont, Alameda County, California.

8.    Defendant Cinemark USA, Inc.("Cinemark") is a Texas corporation that does business in California. Cinemark has its headquarters in Plano, Texas and is a subsidiary of Cinemark Holdings, Inc., which is not registered for service of process or to do business in this state. Cinemark USA, Inc. may be served by service of process on its registered agent, CSC – Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, CA 95833.

### III.    JURISDICTION AND VENUE

9.    The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because Plaintiff brings claims under the federal Video Privacy Protection Act, 18 U.S.C. § 2710.

10.    The Court also has jurisdiction under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for the Class exceeds $5 million, and at least one member of the Class is a citizen of a state different from the Defendant's state of citizenship.

11.    The Court has jurisdiction over Cinemark, and the venue is proper under 28 U.S.C. § 1391(b), because Cinemark does business in and is subject to personal jurisdiction in this district and because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in California.

### IV.    STATEMENT OF FACTS

12.    Plaintiff Stephen Marelich cares deeply about personal privacy. As a concerned citizen, Mr. Marelich believes that everyone has a right to control his or her own private information.

13.    Mr. Marelich lives in Fremont, California, near Cinemark Century at Pacific Commons, which is located at 43917 Pacific Commons Blvd., Fremont, California 94538 and owned by Cinemark. Mr. Marelich has purchased tickets on Cinemark's website at www.cinemark.com to see movies at Cinemark Century at Pacific Commons, including on or about November 2022.

14.    Mr. Marelich has had a Facebook account for more than ten years.

15.    Mr. Marelich has never consented to Cinemark sharing his personal information or video-watching history with any third party.

16.    Notwithstanding Mr. Marelich's lack of consent and unbeknownst to him, Cinemark sent information regarding his video selection and ticket purchases on its website to Facebook.

17.    The private information Cinemark disclosed allowed Facebook to identify Mr. Marelich and learn the internet addresses or universal resource locators ("URLs") of the pages he

had visited on cinemark.com. These URLs included the titles of the movies Mr. Marelich selected and purchased tickets to watch.

18.  As a result of Cinemark's unauthorized disclosure of his video watching history, Mr. Marelich has suffered harm to his privacy interests and has been deprived of the economic value of his private information.

19.  Mr. Marelich did not discover that Cinemark had disclosed his private video watching information to Facebook until August 2023. Since that time, he has not purchased any tickets to watch movies at Cinemark theatres in person at the box office or through third-party services rather than on Cinemark's website.

20.  Mr. Marelich continues to watch movies at Cinemark Century at Pacific Commons and continues to desire the convenience of purchasing tickets online. Mr. Marelich has suffered irreparable injury from these unauthorized disclosures. His private information has been collected, shared, and stored by Facebook and has not been destroyed. He will continue to suffer harm if the website is not redesigned. If the website were redesigned to comply with the VPPA, he would use the www.cinemark.com website to view videos in the future.

## V.    CLASS ALLEGATIONS

### A. The VPPA protects Americans from unauthorized disclosure of their video viewing history.

21.  Congress passed the VPPA in response to a newspaper profile of then-Supreme Court nominee Judge Robert H. Bork, containing a list of 146 films that Judge Bork and his family had rented from a video store. *See Yershov v. Gannett Satellite Info. Network, Inc*., 820 F.3d 482, 485 (1st Cir. 2016). The VPPA prohibits any disclosure of video records without the watcher's informed, written consent. Concerned that video watching history could be used to discover an individual's private tastes, affiliations, and opinions, Congress prohibited any "video tape service provider" from knowingly disclosing consumers' personally identifiable information to "any person." 18 U.S.C. § 2710(b).

22.  Under the VPPA, consumers who view video content have the right to keep their identities and video viewing histories private. To enforce this right, Congress created a civil cause

of action allowing consumers to recover actual damages, liquidated damages not less than $2,500, punitive damages, attorney's fees, and equitable relief for VPPA violations. 18 U.S.C. § 2710(c).

23.   The VPPA's legislative history notes that its authors were particularly concerned with protecting video-watching information because choosing what videos to watch is a core component of each person's intellectual privacy:

> There's a gut feeling that people ought to be able to read books and watch films without the whole world knowing. Books and films are the intellectual vitamins that fuel the growth of individual thought. The whole process of intellectual growth is one of privacy—of quiet, and reflection. This intimate process should be protected from the disruptive intrusion of a roving eye.

S. Rep. No. 100-599 (1988).

24.   With remarkable prescience, Congress foresaw in 1988 that computer technology would create dangerous new privacy threats:

> The advent of the computer means not only that we can be more efficient than ever before, but that we have the ability to be more intrusive than ever before. Every day Americans are forced to provide to businesses and others personal information without having any control over where that information goes…. These records are a window into our loves, likes, and dislikes.

S. Rep. No. 100-599 (statement of Sen. Simon). Anticipating the consumer marketing databases that are so prevalent in the 21st century, Senator Leahy warned against "information pools" and the new privacy threat they posed. *Id.* (statement of Sen. Leahy). He noted that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." *Id.*

25.   Consistent with Congress's privacy-protection goals, the VPPA defines "video tape service provider" broadly to encompass "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes *or similar audio visual materials*." 18 U.S.C. § 2710(a)(4) (emphasis added). By adding "or similar audio visual materials," Congress ensured that this definition, despite having been drafted in the days of brick-and-mortar video cassette rental stores, continues to be just as vital now that video

providers more often offer audio visual materials for sale online. *See In re Hulu Privacy Litig.*, No. 11-cv-03764, 2012 WL 3282960, at *6 (N.D. Cal. Aug. 10, 2012) (holding that "Congress used 'similar audio video materials' to ensure that VPPA's protections would retain their force even as technologies evolve").

**B. Cinemark is subject to the VPPA.**

26. Cinemark is a movie theatre chain whose portfolio includes Cinemark Century at Pacific Commons and numerous other theatres in this district. Cinemark's website allow consumers to select the movie of their choice and to purchase tickets online for video viewing.

27. Because it regularly engages in the business of delivering videos at its multi-state theatre chain and over the internet, Cinemark is a "videotape service provider" subject to the VPPA.

28. Cinemark's website at www.cinemark.com invites consumers to view movie trailers and purchase tickets. Once they have selected a film, consumers are directed to a page on which they can select their seats, after which they are directed to a billing page to enter their credit card information. In order to purchase the tickets or rent or buy the videos, consumers must provide their name, telephone number, email address, and credit card number.

29. Online ticket purchasers are "consumers" under the VPPA, because they rented and/or bought goods or services from Cinemark.

30. Unbeknownst to the consumers, Cinemark has knowingly deployed computer code on its website which tracks and reports consumers' video selection and watching history to third parties, including Facebook, the social media and advertising platform operated by Meta.

31. This computer code, called a "tracking pixel" occupies only a single 1x1 pixel on a user's screen and is purposely designed to be invisible to users. The tracking pixel is a kind of analytics tool which allows website owners to track visitors' actions on their websites and measure the effectiveness of their advertising. Tracking pixels can collect interactions website visitors have with the websites, including searches, form entries, and URLs viewed. Facebook's tracking pixel, called the "Meta Pixel," not only tracks and logs such website activity, but also sends it to

Facebook, along with Internet Protocol ("IP") addresses, Facebook ID's, and other information that allows Facebook to identify the specific individual visiting the tracked website.

### C. Facebook's Meta Pixel tool allows Facebook to track the personal data of individuals across a broad range of third-party websites.

32. Facebook, a social media platform founded in 2004 and today operated by Meta Platforms, Inc., was originally designed as a social networking website for college students.

33. Facebook describes itself as a "real identity" platform. Sam Schechner & Bruce Horowitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, THE WALL STREET JOURNAL, Oct. 21, 2021, https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out11634846701#:~:text=Facebook%20said %20in%20its%20most,of%20them%20than%20developed%20ones. This means that users are permitted only one account and must share "the name they go by in everyday life." Meta, *Account Integrity and Authentic Identity*, https://transparency.fb.com/policies/community-standards/ account-integrity-and-authentic-identity/ (last visited Aug. 28, 2023). To that end, Facebook requires users to provide their first and last names, along with their dates of birth, telephone numbers and/or email addresses, and genders, when creating an account. Facebook, *Signing Up*, https://www.facebook.com/help/406644739431633 (last visited Aug. 28, 2023).

34. In 2007, realizing the value of having direct access to millions of consumers, Facebook began monetizing its platform by launching "Facebook Ads," proclaiming this service to be a "completely new way of advertising online," that would allow "advertisers to deliver more tailored and relevant ads." Meta, *Facebook Unveils Facebook Ads*, (Nov. 6, 2007) https://about.fb.com/ news/2007/11/facebook-unveils-facebook-ads/ (last visited Aug. 28, 2023). Facebook has since evolved into one of the largest advertising companies in the world. John Gramlich, *10 Facts About Americans and Facebook*, PEW RESEARCH CENTER (June 1, 2021) https://www.pewresearch.org/ fact-tank/2021/06/01/facts-about-americans-and-facebook/ (last visited Aug. 28, 2023). Facebook can target users so effectively because it surveils user activity both on and off its website through the use of tracking pixels. Meta, *About Meta Pixel*, https://www.facebook.com/business/ help/742478679120153?id=1205376682832142 (last visited Aug. 28, 2023). This allows

Facebook to make inferences about users based on their interests, behavior, and connections. Meta, *Help your ads find the people who will love your business*, https://www.facebook.com/business/ads/ad-targeting (last visited Aug. 28, 2023).

35. Today, Facebook provides advertising on its own social media platforms, as well as other websites, through its Facebook Audience Network. Facebook has roughly three billion monthly active users. Statistica, *Number of monthly active Facebook users worldwide*, https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide/ (last visited Aug. 28, 2023).

36. Facebook maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications. These profiles are associated with personal identifiers, including IP addresses, cookies, and other device identifiers. Facebook also tracks non-users across the web through its internet marketing products and source code.

37. Facebook offers several advertising options based on the type of audience that an advertiser wants to target. Those options include targeting "Core Audiences," "Custom Audiences," "Look Alike Audiences," and even more granulated approaches within audiences called "Detailed Targeting." Each of Facebook's advertising tools allows an advertiser to target users based on, among other things, their personal data, including geographic location, demographics (e.g., age, gender, education, job title, etc.), interests, (e.g., preferred food, movies), connections (e.g., particular events or Facebook pages), and behaviors (e.g., purchases, device usage, and pages visited). This audience can be created by Facebook, the advertiser, or both working in conjunction.

38. Ad Targeting has been extremely successful due to Facebook's ability to target individuals at a granular level. For example, among many possible target audiences, "Facebook offers advertisers 1.5 million people 'whose activity on Facebook suggests that they're more likely to engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'" Natasha Singer, *What You Don't Know About How Facebook Uses Your Data*, NEW YORK TIMES (April 11, 2018), https://www.nytimes.com/

2018/04/11/technology/facebook-privacy-hearings.html. Aided by highly granular data used to target specific users, Facebook's advertising segment quickly became Facebook's most successful business unit, with millions of companies and individuals utilizing Facebook's advertising services.

39.  To power its advertising business, Facebook uses a variety of tracking tools to collect data about individuals, which it can then share with advertisers. The Meta Pixel that Cinemark uses on its website is one of Facebook's most powerful tools.

40.  The Meta Pixel is a snippet of code that, when embedded on a third-party website, tracks users' activities as they navigate through the website. Meta for Developers, *Meta Pixel*, https://developers.facebook.com/docs/meta-pixel/ (last visited Aug. 28, 2023). Once activated, the Meta Pixel "tracks the people and type of actions they take." Meta, *Retargeting: Inspire people to rediscover what they love about your business*, https://www.facebook.com/business/goals /retargeting (last visited Aug. 28, 2023). Meta Pixel can track and log each page users visit, what buttons they click, as well as specific information that users input into a website. Meta, *About Meta Pixel*, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Aug. 28, 2023). The analytics provided by the Meta Pixel tool allow website developers to improve "website operability" by giving developers insight into how customers use and interact with companies' websites. Annie Burky, *Advocate Aurora says 3M patients' health data possibly exposed through tracking technologies* (Oct. 20, 2022), https://www.fiercehealthcare.com/health-tech/advocate-aurora-health-data-breach-revealed-pixels-protected-health-information-3.

41. In connection with the Meta Pixel, Facebook also places "cookies" on visitors' computers. Cookies are small text files that web servers can place on a user's computer when the user's internet browser interacts with a website server. Cookies are designed to help website owners and third parties identify individual website visitors. Facebook's "c_user" cookie contains the individual's Facebook ID, which allows Facebook (or anyone) to identify the Facebook account associated with the cookie.

42. The Facebook ID is a short, unique string of numbers assigned to each user by Facebook. Anyone who has access to the Facebook ID can use this identifier to quickly and easily locate, access, and view a user's corresponding Facebook profile. One simply needs to log into Facebook and then type "www.facebook.com/#," with the Facebook ID in place of the "#." For example, the Facebook ID for Mark Zuckerberg is 4. Typing "www.facebook.com/4" in any web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

43. Facebook warns web developers that its Pixel is a personal identifier because it enables Facebook "to match your website visitors to their respective Facebook User accounts." Meta for Developers, *Get Started*, https://developers.facebook.com/docs/meta-pixel/get-started (last visited Aug. 28, 2023). When Meta Pixel is incorporated on a website, it can log what searches users perform, which items they click on, which pages they view, and any other actions users take on the site. Along with this data, Facebook collects identifying information like IP addresses, Facebook IDs, and other data that allow Facebook to identify users. Meta Pixel tracks this data regardless of whether a user is logged into Facebook. Grace Oldham & Dhruv Mehrotra, *Facebook and Anti-Abortion Clinics Are Collecting Highly Sensitive Info on Would-Be Patients*, THE MARKUP (June 15, 2022) https://themarkup.org/pixel-hunt/2022/06/15/facebook-and-anti-abortion-clinics-are-collecting-highly-sensitive-info-on-would-be-patients (last visited Aug. 28, 2023).

44. Meta Pixel takes the information it harvests and sends it to Facebook. Facebook can use the Facebook ID not only to readily identify individuals, but also to retrieve all the other information Facebook has regarding that individual, including his or her friends, likes and dislikes, other websites visited, and demographic profile. Facebook can then share analytic metrics with the website host. Facebook also processes and analyzes the information to assimilate it into datasets like Facebook's Core Audiences and Custom Audiences. The consumers' information then becomes available for Facebook's advertisers to use when Facebook sells them targeted advertising services.

45.  Facebook stores this information on its servers, and, in some instances, maintains this information for years. *See* Todd Feathers et al., *Facebook is Receiving Sensitive Medical Information from Hospital Websites*, THE MARKUP (June 16, 2022), https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites (last visited Aug. 28, 2023).

**D.  Cinemark knowingly collected consumers' video viewing information and disclosed this information to Facebook without consent.**

46.  Tracking pixels are not necessary to a website's function. They do not enhance the users' experience, but rather solely benefit website owners and their third-party partners by providing them with valuable analytics and information that can be sold to advertisers. To obtain the code for the pixel, a website owner must contact Facebook and tell Facebook what kind of events the site wants to track, such as pages or videos viewed. Facebook then returns the pixel code for the site administrator to embed into the website.

47.  Cinemark, following Facebook's instructions, has embedded Facebook's Meta Pixel code throughout its website. Cinemark thus knowingly embedded the Meta Pixel on its website understanding that it would cause consumers' personally identifiable information to be sent to Facebook, including on the website pages consumers used to request or obtain video content.

48.  A third-party website like Cinemark that chooses to incorporate the Meta Pixel benefits from the ability to analyze a user's experience and activity on the website to assess the website's functionality and traffic. The third-party website also gains information from its customers through Meta Pixel that can be used to target them with advertisements, as well as to measure the results of advertising efforts.

49.  Facebook provides websites using Meta Pixel with the data it captures in the "Meta Pixel page" in Events Manager, as well as tools and analytics to reach these individuals through future Facebook ads. Meta, *About Meta Pixel*, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Aug. 28, 2023). For example, websites can use this data to create "custom audiences" to target the specific Facebook user, as well as other Facebook users who match "custom audience's" criteria. Meta for Developers, *Custom Audience*,

https://developers.facebook.com/docs/marketing-api/reference/custom-audience/    (last    visited

Aug. 28, 2023). Businesses that use Meta Pixel can also search through Meta Pixel data to find

specific types of users to target, such as men over a certain age. In essence, these businesses, like

Cinemark, have chosen to barter their users' private information for access to Facebook's most

advanced advertising tools.

50.  Because Cinemark chose to use the Meta Pixel, whenever Class members visited pages

on Cinemark's website to request, obtain, and/or view videos, the website's code automatically,

simultaneously, and without Class members' knowledge or consent, caused their personally

identifiable information, including the titles of the videos they selected or bought tickets to watch,

to be disclosed to Facebook.

51.  For example, the screenshots below show information sent by the Cinemark website

to Facebook related to ticket purchases for Cinemark Century at Pacific Commons. Every time a

consumer arrives at the page on which they select their seats for a movie, Cinemark sends the title

of the movie, along with the consumer's Facebook ID, to Facebook. To protect privacy, the

individual's Facebook ID (the contents of the "c_user" cookie highlighted in the red boxes below)

has been redacted:

Figure 1: Cinemark Sends Facebook ID
and Title of Video for Ticket Selection to Facebook

id: 903038909837745

ev: Purchase

dl: https://www.cinemark.com/Confirmation/10604773389515?tok=9gtUFHzMDNHa
EYA96gkXMjnmfycd9q8Vtl%2bktIXPRMY%3d

rl: https://www.cinemark.com/checkout

if: false

ts: 1693349525368

cd[content_name]: ["Barbie"]

cd[content_ids]: ["92056"]

cd[content_category]: ["Movie"]

cd[content_type]: product

cd[value]: 8.6

cd[num_items]: 1

cd[currency]: USD

cd[customer_type]: Returning

cd[search_string]: ["Web Surcharge","Discount Day"]

cd[theater_id]: 1060

sw: 5120

sh: 1440

ud[em]: a2073d002dcf3ac491a1ab6c83a0877cffdf3f90e2454b25e67be0f3291983a

**Request Cookies**    ☐ show filtered out request cookies

| Name | Value | Do... | P | E | S | H | S... | S... | P... | P |
|------|-------|-------|---|---|---|---|------|------|------|---|
| sb | eHTuZPmd2dk0BSms... | .fac... | / | 2. | 2. | ✓ | ✓ | N... | | M. |
| datr | eXTuZlJc7SAFVVCOz... | .fac... | / | 2. | 2. | ✓ | ✓ | N... | | M. |
| c_user | | .fac... | / | 2. | 2. | | ✓ | N... | | M. |
| xs | 33%3Aro-XoQSqKX5... | .fac... | / | 2. | 4. | ✓ | ✓ | N... | | M. |
| fr | 0QV0stDwCKX73wD... | .fac... | / | 2. | 8. | ✓ | ✓ | N... | | M. |

Figure 2: Cinemark Sends Facebook ID
and Title of Video for Ticket Purchase to Facebook

52. Cinemark could easily redesign its website to provide all of the services its customers use and enjoy without disclosing this private information to Facebook. Cinemark's use of the Meta Pixel does not enhance consumers' experience on the website, but is instead a deliberate decision by Cinemark to benefit itself at the expense of consumers' privacy.

53. At no point did consumers consent to the sharing of this information, nor were they even informed that their video viewing information was being shared with Facebook.

54. This disclosure was not incident to Cinemark's ordinary course of business, because it did not occur as part of Cinemark's debt collection activities, order fulfillment, request processing, or a transfer of ownership. *See* 18 U.S.C. § 2710(a)(2).

55. Cinemark thus knowingly and without Plaintiff's and the Class members' consent disclosed their video watching history and personally identifying information to third parties in violation of the VPPA.

**E. Cinemark's unauthorized disclosures harmed Class members' privacy and deprived them of the value of their personal information.**

56. This unauthorized disclosure of Plaintiff's and the Class members' personally identifiable information and video watching history violated their privacy interests, which Congress sought to protect by enacting the VPPA.

57. The private information Cinemark disclosed also has economic value. As *The Economist* recognized in 2017, the "world's most valuable resource is no longer oil, but data." *The World's Most Valuable Resource Is No Longer Oil, But Data*, THE ECONOMIST (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data (last visited Aug. 30, 2023). In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people." Emily Steel, et al., *How much is your personal data worth?*, FINANCIAL TIMES (June 12, 2013), https://ig.ft.com/how-much-is-your-personal-data-worth/ (last visited Aug. 30, 2023). In 2015, *TechCrunch* reported that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data can

vary from $15 to more than $40 per user. Pauline Glikman & Nicolas Glady, *What's the Value of Your Data?*, TECHCRUNCH (Oct. 13, 2015), https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/ (last visited Aug. 30, 2023).

58. Further, individuals can sell or monetize their own data if they so choose. For example, Facebook has offered to pay individuals for their voice recordings[2] and has paid teenagers and adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smart phones. Saheli Chaudhry & Ryan Brown, *Facebook pays teens to install an app that could collect all kinds of data*, CNBC (Jan. 29, 2019), https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html (last visited Aug. 30, 2023). A myriad of other companies and apps such as DataCoup, Nielsen Computer, Killi, and UpVoice also offer consumers money in exchange for access to their personal data. Sam Hawrylack, *Apps That Pay You for Data Collection*, CREDITDONKEY (June 12, 2021), *https://www.creditdonkey.com/best-apps-data-collection.html* (last visited Aug. 30, 2023); *see also* Illia Lahunou, *Can You Earn Money From Your Data? Yes, You Can. And Here's How!*, MONETHA, *https://www.monetha.io/blog/rewards/earn-money-from-your-data* (last visited Aug. 30, 2023).

59. In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price." Geoffrey Fowler, *There's no escape from Facebook, even if you don't use it*, THE WASHINGTON POST (Aug. 20, 2021), https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/ (last visited Aug. 30, 2023). This price is only increasing. According to Facebook's own financial statements, the value of the average American's data in advertising sales rose from $19 to $164 per year between 2013 and 2020. *Id.*

---

[2] Jay Peters, *Facebook will now pay for your voice recordings*, THE VERGE (Feb. 20, 2020), https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-prounciations-app (last visited Aug. 30, 2023).

60. In exchange for disclosing private information about its customers, Cinemark is compensated by Facebook with enhanced online advertising services, including but not limited to retargeting and enhanced analytics functions.

61. By disclosing this valuable information without Plaintiff's and the Class members' consent, Cinemark has deprived them of the economic value of their private video watching history. Many Class members, however, may not know that their privacy has been violated or may not have the ability to hire counsel and pursue their own claims. Plaintiff therefore brings this action on behalf of the Class to stop Cinemark's privacy violations and recover compensation for Class members.

## F. The Class

62. Plaintiff brings this action on his own behalf and as a class action pursuant to Federal Rule of Civil Procedure 23 for the following Class:

> All Facebook account holders in the United States who purchased movie tickets on the website www.cinemark.com from two years preceding the filing of this Complaint to the present.

Excluded from the Class are any employees, officers, or directors of Cinemark, any attorneys appearing in this case, and any judges or jurors assigned to hear this case as well as their immediate family and staff.

63. **Ascertainability**. The Class is ascertainable in that it is comprised of individuals who can be identified by reference to purely objective criteria, including information from Cinemark's and Facebook/Meta's business records. Notice may be mailed to Class members using the information in Cinemark's files, as updated through the National Change of Address Registry and other commercially available means.

64. **Numerosity. FED. R. CIV. P. 23(a)(1)**. The Class is so numerous that joinder of all members is impracticable. Although the precise number of Class members is not currently known, the fact that Cinemark has over 300 theatres in the United States shows that the Class likely consists of at least thousands of persons and, therefore, it would be impracticable to bring all these persons before the Court as individual plaintiffs.

65. **Typicality.** FED. R. CIV. P. 23(a)(3). Plaintiff's claims are typical of each member of the Class he seeks to represent. These claims all arise from the same operative facts and are based on the same legal theories.

66. **Adequacy of Representation**. FED. R. CIV. P. 23(a)(4). Plaintiff will fairly and adequately protect the interest of the Class. Plaintiff is committed to vigorously litigating this matter, and his interests are aligned with those of the Class. Plaintiff has retained counsel experienced in handling consumer privacy class actions.

67. **Commonality and Predominance**. FED. R. CIV. P. 23(a)(2) & (b)(3). Common issues of law and fact exist regarding Plaintiff's and the Class members' claims and predominate over any individual issues. These common issues include:

(a) Whether Cinemark disclosed Class members' personally identifiable information to a third party;

(b) Whether Cinemark's disclosures of personally identifiable information were knowing;

(c) Whether Class members consented to Cinemark's disclosures of their personally identifiable information;

(d) Whether the Class is entitled to damages; and

(e) Whether injunctive relief is appropriate to prevent further illegal disclosures of personally identifiable information.

68. **Superiority**. FED. R. CIV. P. 23(b)(3). A class action is a superior method for the fair and efficient adjudication of this controversy. Class members' interests in individually controlling the prosecution of separate claims against Cinemark is small, as the statutory damages recoverable by any one Class member is $2,500 under the VPPA. Management of the Class's claims in a single proceeding will avoid inconsistent judgments and result in a more efficient use of judicial resources than resolving these same issues in many individual actions.

69. **Injunctive Relief Appropriate to the Class**. FED. R. CIV. P. 23(b)(2). This action should also be maintained as a class action because Cinemark has acted or refused to act on grounds that apply generally to the Class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## VI.    CLAIM

### COUNT ONE – VIDEO PRIVACY PROTECTION ACT, 18 U.S.C. § 2710

### *(On behalf of the Class)*

70.  Plaintiff incorporates the preceding paragraphs as though fully set forth here.

71.  Defendant Cinemark is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it engaged in the business of delivering audio visual materials similar to prerecorded video cassette tapes in interstate commerce.

72.  Plaintiff and the Class members are consumers under the VPPA, 18 U.S.C. § 2710(a)(1), because they purchased Cinemark's goods or services.

73.  Cinemark knowingly disclosed personally identifiable information which identified Plaintiff and the Class members as having requested or obtained specific video materials and/or services from Cinemark to a third party, Meta Platforms, Inc., without their consent.

74.  By disclosing Plaintiff's and the Class members' personally identifiable information, Cinemark violated their statutorily protected privacy rights and deprived them of the value of their private information.

75.  As a result of these violations, Cinemark is liable to Plaintiff and the Class members for liquidated damages not less than $2,500 per person, as well as punitive damages, costs, and attorney's fees.

76.  Injunctive relief and declaratory relief are also appropriate to prevent Cinemark from continuing its illegal conduct.

## VII.    CONCLUSION AND PRAYER

WHEREFORE, Plaintiff, individually and on behalf the Class, respectfully requests that the Court enter judgment ordering relief as follows:

(a)  certifying the Class pursuant to Federal Rule of Civil Procedure 23(b)(3) and/or (b)(2);

(b)  appointing Plaintiff to represent the Class;

(c)  appointing Plaintiff's counsel as Class Counsel;

(d)  declaring that Cinemark is financially responsible for notifying all Class members about this suit;

(e)  enjoining Cinemark from further violations of the Video Privacy Protection Act;

(f)  awarding Plaintiff and the Class members liquidated damages of not less than $2,500 each and punitive damages pursuant to 18 U.S.C. § 2710(c)(2);

(g)  awarding Plaintiff and the Class members reasonable attorneys' fees, expenses, and costs of suit, pursuant to 18 U.S.C. § 2710(c)(2), the common fund theory, or any other applicable statute, theory, or contract;

(h)  granting leave to amend the Complaint to conform to the evidence produced at trial; and

(i)  awarding such other relief as this Court may deem just and proper.

## VIII.  DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all claims so triable.

Dated: September 14, 2023

Respectfully submitted,

By: */s/ Michael A. Caddell*
Michael A. Caddell
mac@caddellchapman.com
Cynthia B. Chapman
cbc@caddellchapman.com
Amy E. Tabor
aet@caddellchapman.com
CADDELL & CHAPMAN
628 East 9th St.
Houston TX 77007
Tel.: (713) 751-0400
Fax: (713) 751-0906

*Attorneys for Plaintiff*